UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,

     Plaintiff,                  Criminal Action No.
                                  1:23-cr-10127-LTS-5

    v.

ZACHARY MARSHALL,

     Defendant.

_____


BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


SENTENCING



Wednesday, April 10 2024
3:10 p.m.






John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiff:

    UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
    BY:  PHILIP A. MALLARD
    John Joseph Moakley Courthouse
    One Courthouse Way, Suite 9200
    Boston, Massachusetts  02210
    (617) 748-3674
    philip.mallard@usdoj.gov


On behalf of the Defendant:

    CLOHERTY & STEINBERG LLP
    BY:  DANIEL J. CLOHERTY AND ALEXANDRA ARNOLD
    33 Arch Street
    Suite 3150
    Boston, Massachusetts  02110
    (617) 481-0160
    dcloherty@clohertysteinberg.com
    aarnold@clohertysteinberg.com

**P R O C E E D I N G S**

(In open court.)

THE DEPUTY CLERK:  The United States District Court for the District of Massachusetts is now in session, the Honorable Leo T. Sorokin presiding.

THE COURT:  Please be seated.

THE DEPUTY CLERK:  Today is Wednesday, April 10th, 2024, and we are on the record in criminal case number 23-cr-10127, it United States versus Zachary Marshall.

MR. MALLARD:  Philip Mallard for the United States.

THE COURT:  Good afternoon.

MR. CLOHERTY:  Good afternoon, Daniel Cloherty, on behalf of Mr. Marshall, who's here to my right.

MS. ARNOLD:  And Alexandra Arnold, also for Mr. Marshall.

THE COURT:  Good afternoon to both of you.

And good afternoon, Mr. Marshall.

MR. MARSHALL:  Good afternoon.

THE COURT:  So I have -- I have the presentence report, revised 4/3/24.

You reviewed that with your client, right, Mr. Cloherty?

MR. CLOHERTY:  I have, Your Honor.

THE COURT:  And then I have Mr. Marshall's restorative justice reflections that you filed.  I have,

Mr. Cloherty, then sentencing memo that you filed.  I have the letters in support that you filed.  And I have the government's sentencing memorandum.

I think that's everything, right?

MR. MALLARD:  Yes, Your Honor.

MR. CLOHERTY:  Judge, just to be clear, we had one, sort of, late arriving letters.  So we actually made two filings of letters of support.  I just want to make sure that you have that.  There was a batch of eight or nine, and then, I think, on Monday, we had another one --

THE COURT:  Maybe I'll have Sam --

MR. CLOHERTY:  We have a copy of it if you need it.

THE COURT:  I'll take it.

The one that I'm holding right here is filed on April 3rd --

MR. CLOHERTY:  The letters of support.

MS. ARNOLD:  And there were also some certificates, Your Honor, of completion.

MR. CLOHERTY:  Oh, that's right.  Thank you, Alex.

THE COURT:  I think I looked at those, but you should give them to me, anyway, so I have them here.  Give me one minute.

Okay.  So, first, there are a number of objections to the presentence report.  Let me run through those.

MR. CLOHERTY:  Sure.

THE COURT:  The first is probation included in the loss calculation some catalytic converter thefts that occurred in Mansfield, I think it was on April 6th, which, in the plea agreement, was not included in the agreement.  And I am just wondering, given what's in the presentence report about the facts and what's in the plea facts -- I don't know that he admitted to those facts.  I didn't look back at the transcript.  But what's the basis for not including them?

MR. MALLARD:  Your Honor, I told the Court that when we got the PSR back, it was over 550.  I was struggling to recall the means by which counsel and I got to that number.  So there's a specific objection in the Mansfield thefts, and whether it was my addition mistake, subtraction mistake, whatever it was, we're at a 250 to 550 loss calculation.  I believe, in our conversations, that there was a good faith defense by the defendant that he did not commit the thefts in Mansfield on that night.  And I believe they were carved out of the plea facts, if I recall correctly.

THE COURT:  Okay.

MR. MALLARD:  Now, the facts are that the GPS goes to his house that night.  And they are what they are.  But, you know, I stand by the plea agreement.  As I've said in other sentencings, I don't think the sort of rigid formalities of the --

THE COURT:  I understand, but I still need to --

MR. MALLARD:  Certainly.

THE COURT:  -- apply the rigid form.

So your best understanding is you reached an agreement, the agreement in the plea agreement, that there were two things.  It's possible you made a mathematical error.

MR. MALLARD:  Correct.

THE COURT:  But there are certainly the facts that show the GPS going to his house, the Acura GPS, and then going there at the end of the night.  And the Acura GPS went to Mansfield and did the robberies.  But there was also some argument advanced by the defense that persuaded you, you should drop those out.

Not everything that night, but just Mansfield?

MR. MALLARD:  Correct.  And I think it may have actually turned a little bit upon Mansfield -- there's a lot of thefts in this case, so I apologize for this.  I believe Mansfield might have been the same day as the thefts that took place, but were --

THE COURT:  The same 24-hour day, but not sequential?

MR. MALLARD:  Correct.  I believe that's another possibility, though, I have to say, I'm struggling to recall exactly what it was.  Nevertheless, we came to an agreement on that point.  Considering that it's over 100 cars, I didn't

really want to --

THE COURT:  I understand you're standing by your agreement.  I'm just trying to figure out, since I have to make a ruling not on your agreement but on the facts that are before me, why I shouldn't agree with probation?

And I'm wondering what the reason, if you're willing to advance it, Mr. Cloherty, was.

MR. CLOHERTY:  It's simply disputing his involvement with those thefts at that time.  So it was -- it's not -- it's no further than that.  In other words --

THE COURT:  He didn't go to the Mansfield -- is it because Mansfield occurred in the same 24-hour day, but not sequential with the others?  Or some other argument?

MR. CLOHERTY:  Well, the record is what it is on that.  I think it -- it did occur at a different time that day, earlier in the -- it was earlier in sequence is, I guess, all I'll say.  Again, I don't think -- and I don't want to be too formalistic here, Your Honor.  I don't think it's our burden on this.

THE COURT:  No, it's not your burden.  But here's the thing that I'm wondering.  I think it's the burden of -- well, it's not really the government.  An enhancement can't be applied, unless the evidence by preponderance shows that it does apply.

MR. CLOHERTY:  Right.

THE COURT:  So the way that I was thinking about it was this:

That the GPS on the Acura shows that the Acura went to all the places that are attributed in the PSR for April 6th for catalytic converter robberies.  That doesn't mean Mr. Marshall went there, but the Acura did.

And the GPS, according to the PSR, shows that before doing these robberies, is what it seems to say, is it went to Mr. Marshall's house; And that after the robberies, it stopped at Mr. Marshall's house, if you will, on the way back, before the Acura went home; and that Mr. Marshall was involved in a number of the other robberies on April 6th. And that would lead, ordinarily, I think, to a reasonable inference, that, by preponderance, he was also involved -- in the absence of other evidence, that he was involved in the Mansfield.

I think that's the reasoning that probation -- I haven't talked to them, but I think that's the reasoning they applied.

So I'm just -- you don't have any burden, but I'm just being candid with you that, on those facts, that's where it would lead me to.

Now, if -- if the Acura GPS went to Mr. Marshall's house, on April 5th, at 11:00 p.m., and returned to his house at 5:00 in the morning, on April 6th, and the Mansfield

robberies were April 6th, after 5:00 a.m., that would suggest to me that -- there wouldn't be enough evidence in the record to say that he was involved in those.  Or there could be another -- but I don't know that.

MR. CLOHERTY:  Yeah, I understand.  And I understand, Your Honor, I guess I would dispute Your Honor's conclusion that what you describe is sufficient to meet the burden -- the evidentiary burden.  You may disagree with me -- it sounds like you might -- because I don't think that's quite enough to get to the preponderance burden that they have.  All I can say is that we do dispute his involvement, his actual involvement in those thefts, from those, I believe, it's six vehicles --

THE COURT:  In Mansfield.

MR. CLOHERTY:  -- in Mansfield.

THE COURT:  But why wouldn't what I described -- you certainly don't have to agree with me.

MR. CLOHERTY:  Yup.

THE COURT:  Few people do.

MR. MALLARD:  Judge, you know what?  I'm reviewing it now in front of me here --

THE COURT:  Yes.

MR. MALLARD:  -- and because the GPS shows that it was in Mansfield from 12:08 to 12:36 p.m.

THE COURT:  Oh.  So that would be in the afternoon

of April 6th.

MR. MALLARD:  No, I'm sorry, no.  It's there for 12:08 to 12:36, during the last one being hit.  But the other ones that take place in paragraph number 105, it is not triggering in those areas.  I don't have a car, I don't have a GPS in the vehicle at the location of those thefts in paragraph 105.

THE COURT:  Five of the six.

MR. MALLARD:  Correct.  So there's one that takes place at -- there's no video.  But we put it at the location --

THE COURT:  You put the car at the location.

MR. MALLARD:  For paragraph 106.

For paragraph 105, we have videos showing the thefts take place when it's not in the town.

THE COURT:  You have videos of the thefts taking place, but the Acura is not there then, according to the Acura GPS.

MR. MALLARD:  From what I recall, these videos don't give me enough to say it's the Acura.  It's a dark colored SUV.

THE COURT:  Oh, I see.  Just so I understand, paragraph 106 is one converter in Methuen -- I'm sorry, Mansfield.

MR. MALLARD:  Correct.

THE COURT:  And you have the Acura GPS there at the time.

MR. MALLARD:  Correct.

THE COURT:  And a catalytic converter theft.

MR. MALLARD:  Correct.

THE COURT:  But the five that are in 105, you have video from the location showing the thefts and showing a dark SUV, but not sufficiently clear to say, by preponderance, that it's the Acura.  And you don't have GPS data showing the Acura there.

MR. MALLARD:  I have it at 1:22 on the video.  The GPS does not have it there on 1:22.  So we -- you know, I think it's not to say that they didn't do it --

THE COURT:  No, I understand.

MR. MALLARD:  -- I just don't have Acura GPS data saying that was the same Acura that was a part of this.  So I think we excluded this from the calculation.

MR. CLOHERTY:  And I think, Your Honor, I think this was clear, it was not included, -- those were not included in the plea facts that were filed.  So the plea facts did not include those.

THE COURT:  So I hate to be really a stickler, but if I remove -- that sounds -- to me that sounds reasonable.  And it also seems fair in that you have taken a consistent, sort of, approach as to how much evidence in order to

attribute a theft to vehicle or person, and you weren't attributing thefts to other people on that kind of evidence, so it seems consistent across the case to not attribute those.  So that would knock out five thefts, right?

MR. MALLARD:  Correct.

THE COURT:  And that would knock out $25,000 in loss.

MR. MALLARD:  And that gets us down to below the 550 threshold.  Now that I'm back in my mindset of this plea, paragraph 25 was carved out because the GPS was not consistent with the time on the video.

THE COURT:  I don't know.  I guess that's my --

MR. CLOHERTY:  I think, Your Honor -- well, I guess -- I don't want to interrupt you, but I think you're thinking what I'm thinking.  We're at 6, because that's where the threshold gets crossed.

THE COURT:  Because if you knock out five -- I agree with those five -- that's $25,000.  And that goes from 578 to 553.  And that 553 is still the range probation found.

MR. MALLARD:  And, I'm sorry, in paragraph 106, I don't have video for that one.  Even though I have it in the area, I don't have the video date and time.

THE COURT:  Say it again. Hold on.  Hold on.  Let me look at 106.

So for 106, you have what?

MR. MALLARD:  I don't have a date and time on the video.

THE COURT:  The video from the location.

MR. MALLARD:  From the location.

I have it in Mansfield from a period of 12:08 to 12:36, but I don't have video from that location.  So I think we exclude those ones, as well.

THE COURT:  You mean you just know that the Acura was in Mansfield for those 28 minutes, and you know that the catalytic converters in paragraph 105 and in 106 were stolen some time between April 5th, when people left those workplaces, and April 6th when they arrived there.

MR. MALLARD:  Correct.

THE COURT:  And so for that reason, you didn't attribute either the five or the one to him.

MR. MALLARD:  That's my recollection now.

THE COURT:  Are you attributing those six to anybody else?

MR. MALLARD:  I'm not -- the only other person that would be at issue with this one would be Rafael Davila.  I guess I'll deal with him when I get to him, but I don't think so.

THE COURT:  Is that the criteria -- what is the criteria that's been applied to --

MR. MALLARD:  So for the one with the GPS in the

car, the GPS is obviously going to be direct and very precise as to the stop at the time reflected on the -- the car --

THE COURT:  So the GPS doesn't show that it's stopping at these locations?

MR. MALLARD:  It shows it in the area, just not the time of the videos.  And that was our problem, is that there might have been another car involved.  The Acura might have been a scout car for that night, and there might have been a second vehicle doing the cutting.  I didn't have the Acura, at the time of that theft, GPS hitting when the theft took place.  So he's there; they're there at the same location, just not at the time when the video shows that it went down.

The criteria for the GPS times are clear identification of the Acura -- we don't have that for the Mansfield thefts -- and GPS coordination.  And then we also wanted to have text messages, and we didn't have text messages from April 6th, because we didn't have updated iCloud data for April 6th.  So all of that stuff would have been post takedown.  And because of the nature of the plea moving so fast, we didn't actually go back and do that, because everyone sort of resolved the case.

THE COURT:  All right.  I think it makes it hard to apply to thefts because the nature of the -- you relied on, pretty clear, strong evidence that attribute -- but I do think that -- I'm not saying that it has to be the same

ruling for --

Rafael Davila is the only other one that you allege went out that night?

MR. MALLARD:  Correct.

THE COURT:  I think, if it's the same evidence, I think it's hard -- I'm not -- I will decide that when Mr. Davila's lawyer is here, but it does seem difficult to treat them differently in the absence of additional evidence that's specific to him.

MR. MALLARD:  I completely agree, Your Honor.  If the Court wants to strike those two paragraphs, I'm happy to do that.

THE COURT:  Okay.  I'm not going to strike them from the PSR, but I'm going to sustain, unless there's something else that probation wants to add.

THE PROBATION OFFICER:  No, Your Honor.  But I agree with your analysis.  If there's not enough evidence to hold him for it, there's not enough to hold Davila from it.  So I would be inclined to just take that information out of the PSR in preparation in Davila's if it's not accurate.

THE COURT:  I see.  Fine.  So when you do -- well, do you want me to strike it, or just you're saying in Davila's --

THE PROBATION OFFICER:  No, I don't think you need to strike it in this case, no.

THE COURT:  You're just saying in the next one you're not going to include it.

THE PROBATION OFFICER:  I think your finding stands.  Yeah.

THE COURT:  Yeah, that makes sense.

So the objection to the parties' objection to the 2B1.1(b)(1)(H) --

All in parenthesis, Sam.

-- 14-level -- 14-point enhancement is sustained, and it is a 12-point enhancement.

So then, running through the -- so as to the others, I'm going to run through the offense conduct and address the objections that you raised, the objections that you raised, Mr. Mallard, and then we'll get to the revised range.

So it's a base offense level -- stop me if you disagree with any of these, and I'll stop -- at the end, we'll circle back to the enhancements you want, Mr. Mallard. A base offense level of six, plus 12, because the loss was more than 250 but less than $550,000; plus two for ten or more victims; plus two because the offense involved an organized scheme to steal or receive stolen vehicle parts.

Then pausing there, there are several enhancements that the government objects to probation's omission.  The first is sophisticated means.  I'm happy to hear you,

Mr. Mallard, but my thought -- I know what your arguments are. You know what my rulings have been. It seems to me that it's twofold. Probation's view has been there aren't sophisticated means, period. I have not sustained your objection in any of the cases so far. And in each of those cases, it's because even if there were sophisticated means in the offense, there wasn't specific evidence that this defendant committed the acts that constitute the sophisticated means. I think that same ruling applies here, as that is the things that you're identifying as sophisticated means aren't Mr. Marshall's doings.

And so I'll hear you, if you wish, but my thought is -- my tentative view is I'm overruling that objection for that reason, any other reasons expressed by probation, and your rights will be saved.

MR. MALLARD: So the only thing else on that, Your Honor, is Mr. Feliberty, you did sustain it, plus-two for sophisticated means, but he had the other types of thefts, including the ATMs.

THE COURT: Oh, right. Okay. But not with respect to the cars.

MR. MALLARD: Correct.

THE COURT: Okay. Thank you.

MR. MALLARD: So I just wanted to note that.

I'll just be very brief with respect to

Mr. Marshall in this case.  He certainly, I think, sits more similar to Nicolas Davila, where you did not find it. Mr. Davila -- Rafael Davila has got his operation sort of plugging and playing different people into his organization to fill a certain night, and I understand that and the Court's ruling on that.

I would say the slight distinction here is that this defendant does travel with Rafael Davila down to Florida, with a Suburban full of catalytic converters to monetize them.  He's part of that trip.  He's part of the interaction with Virginia state police when they get pulled over.  They towed the same company line about these products not being stolen, et cetera.  They get through that incident without any sort of arrest or anything.  So I will just say, in terms of --

THE COURT:  That strikes me as a culpability, not a sophisticated means.

MR. MALLARD:  Right.  I completely understand, Your Honor, and that's the only point of distinction that I would make.

THE COURT:  Right.  Okay.  So then that objection is overruled.

The next you have -- you have one other, which is the reckless endangerment from the high speed flights?

MR. MALLARD:  Correct, Your Honor.

THE COURT:  So let me tell you some tentative thoughts, and then I'm happy to hear you.  The tentative thought is this.  First, as to the facts, this is what I read the facts to be from the PSR:

That there are three at issue, high speed chases; that each of the high speed -- or there's three high speed flights, each of which involves a period of time for which there's a chase, but is not a chase the entire time;

That the -- each time it's the Acura that's in flight;

That all three times, the Acura is teaching speeds of 115 miles an hour, or thereabouts;

That all three times it is in the dead of night, between, sort of, 1:00 and 3:00 a.m.;

That they're on -- most of the flight is on the highway, but some of it is -- there's one instance where, on the ramp to I-95, the Acura cuts off another vehicle as it speeds onto the ramp;

That in each instance, it was local police that had engaged with the Acura and gave up or disengaged after some period of time;

And in at least one instance, but not all three instances, the lights on the Acura were off.

So my understanding of the law is, is you need two things.  You need, one, reckless endangerment within the

meaning of the guideline to have occurred; and two, that this defendant either did it or aided and counselled or urged and encouraged, something of those lines, activity along those lines to do that.

So you have evidence that he's in the Acura each of those three occasions, but no evidence that he's the driver. And it's not his car.  And no evidence about what was said to each other in the Acura.

And then second, the cases seem to be there's nothing about that that's sensible, appropriate, wise, or any other word that you want to use.  So we're clear, that's not what it is.  But the cases all tend to be more egregious. They tend to be very high speed chases, in broad daylight, in residential neighborhoods, in school districts, or there's people out and about, where there's crashes, there's different -- there's speeding at law enforcement vehicles. There are other different level of engagement.

So the two problems that I see -- and that's why I'm telling you this in advance so if you want to address them.  But the two problems is one isn't really -- I'm not minimizing it, but I think the guidelines set a pretty high level in the case law, particularly; and second, what's the evidence that he -- even if it was reckless endangerment, what's to say it was him?  And what would give me a basis to draw the reasonable inference that he did enough to have it

apply to him, even if it was reckless endangerment?

MR. MALLARD:  So I'd start with him being the driver.  So in the plea agreement, we -- I reference the plus two enhancement under the 2B1.1(b)(16)(A), which is in the actual guideline itself.

THE COURT:  Hold on.  Let me pull it up.  2B --

MR. MALLARD:  1.1(b)(16)(A).  So that has a reckless -- or conscious or reckless risk of death or serious bodily injury sort of also built into the guideline for this crime itself.

THE COURT:  If the offense involved conscious or reckless risk of death or serious bodily injury.

MR. MALLARD:  So the government's position, you know, I think they're mutually exclusive, and I think you can't double count.  And I think the comment note for this one or the one in the 3C1.2 says you can't double count if it's already accounted for in the specific offense conduct.

So for this one, Your Honor, I don't believe there's a requirement that the defendant himself be the driver.

THE COURT:  I'm not saying he has to be the driver, but it's -- I think, but you tell me, he either has to be the driver, that would clearly mean he's the person responsibility for the behavior we're discussing, or he has to be not the driver, but he has to be telling the

driver, "Do it," or something along those lines.

MR. MALLARD:  I agree for 3C1.2, for the adjustment.

THE COURT:  Yes.

MR. MALLARD:  But for the enhancement for the offense conduct, there's no such requirement in the comments, and it's just that the offense involved the conscious or reckless risk of death or serious bodily injury.

So in this case, where the actual crime is the transportation, that is, the driving of the stolen property, where the driving of that stolen property entails speeds upwards of 100, and whatever, miles an hour, the government's position is the chases themselves, which have stolen property in the back of the Acura, involve the --

THE COURT:  Do you think the level of -- do you think the conscious or reckless risk of death or serious bodily injury is the same as -- putting aside the offense versus defendant -- of recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing?

MR. MALLARD:  So I'll say this, Your Honor. Obviously, I wasn't there.  We definitely -- all these three thefts -- these three flights took place with the GPS on it, so we know how fast they were going.  That's how I can recite to you the speeds.

The local departments were, as we're watching this case develop, as we were aggregating thefts, we would have to tell the local departments, "Hey, we knew this was going to took place, and this took place."  Those departments, in the heat of these moments, we were conducting surveillance sort of --

THE COURT:  They didn't know at that moment that you had a GPS on the car.

MR. MALLARD:  Correct.  And they made their own internal decisionmaking to cease the chase, because their own policies say -- police departments have their own policies not to pursue at certain speeds based upon the risk.  So they made the decision to --

THE COURT:  I take it the risk and the nature of the issue?

MR. MALLARD:  I assume if it's like a mass murder, they might continue to pursue.  But obviously, in a property theft case, they're not.

THE COURT:  Right.

MR. MALLARD:  So I say that kind of gives you some insight into what the local departments are dealing with in terms of how they assess the risk.  I think the speed itself presents a -- anything over 120 miles an hour, I think, presents the potential for serious bodily injury, whether it's on a super highway, the Autobahn, or a back road or a

residence.  I think it's serious bodily injury not just to other people who might be on the road, but also to themselves.

So I do think, in this case, the speed itself gets above that threshold.  I think because it's built into the guideline, it's not required that he be the actual driver.

And in terms of it being reasonably foreseeable, Your Honor, there were three of them.  And maybe the first one, you're sitting there in the passenger seat, and Rafael Davila cranks it over 100, and you're like, okay, that wasn't what I expected.  But in the scope of four months, where this defendant is the right-hand man in the car with Mr. Davila, it happens three times.  And each of those three times, it's the same process.

So for at least number two and number three, you can't say you didn't know that this is what he was going to do.  Because he did it before, and you watched it happen, and you got back in the car with him after.

So I think the reasonably foreseeable is -- attaches here because it happened three times in the same circumstance, even if Rafael was the driver.  By the second and third, you know that this offense is going to involve a high speed chase, over 100 miles an hour going forward.

THE COURT:  What do you say, Mr. Cloherty?

MR. CLOHERTY:  Ms. Arnold is going to address this

issue.

THE COURT:  Okay.  Go ahead, Ms. Arnold.

MS. ARNOLD:  Thank you, Your Honor.

So two points, beginning with the other enhancement, which is (b)(16)(A), I believe that's an incorrect application of the enhancement.

THE COURT:  Of 2B --

MS. ARNOLD:  Of 2B1.1(b)(16)(A).  And there's a Sixth Circuit case, *United States v. Hall*, in which a husband and wife committed a bank fraud, and then engaged the police in a high speed chase.  And the enhancement, which I believe was, at that point, a different one, but has now become (b)(16)(A), the district court assessed that enhancement, but that was reversed on appeal, because the appellate court determined that, actually, what that enhancement provided for was that the offense conduct itself, the fraud, had to result in some sort of reckless endangerment.  And the Sixth Circuit decided that that was an error and also pointed to a different provision, which is 3C1.2, which is the one that we actually briefed on, was the proper enhancement to apply in that case.

And the Sixth Circuit cited a number of other cases for that proposition, including the Second Circuit, the Tenth, the Eighth, I believe, all cases which determined that, as to that first enhancement, (b)(16)(A), the

fraudulent -- or that the conduct itself, the criminal conduct, had to result in reckless endangerment, not the chase after the conduct.

So that would be the argument as to B1.1(b)(16)(A).

As to the other enhancement, which is 3C1.2, as to that enhancement --

THE COURT:  Just pause on that.

Did *Hall* say that the flight was not relevant conduct, or did they just say that the way to interpret the language of what is now 15, if the offense involved was -- this was focused on the offense, the conduct that is the crime as distinct to all the relevant conduct, and 3C1.whatever took care of when people fled.

MS. ARNOLD:  That's exactly correct, Your Honor.

THE COURT:  I see.

MS. ARNOLD:  What it said specifically, the quote was that, "The fraudulent conduct itself did not create the risk of serious bodily injury."  So the criminal conduct for which the person was being sentenced had not actually caused the reckless endangerment in that case.

MR. MALLARD:  The only thing -- I'm actually familiar with that line of cases, and I was thinking to myself, at first blush, maybe it doesn't apply.  And I remember when we did this plea agreement, you know, it does. The crime here is transport.  It's the driving of the stolen

property.  And I think the bank fraud cases, sort of -- the bank fraud happens, and then the high speed flight.  In those cases, certainly the flight after the fact is not the crime.  He's not charged with the flight.

Here he's actually charged with the transportation.  Like, that is the crime.  And the stolen property is in the back, and they're transporting it and it's stolen and it's crossing state lines and they're agreeing that it's going across state lines.

THE COURT:  Did these three high speed chases involve any of them crossing state lines?

MR. MALLARD:  The three -- I think in the Shrewsbury one, one of them they definitely lights off into Rhode Island.  That might have been the Northbridge one?  I got to check back on that.  But I believe at one of them, they did.  Don't quote me on it, but I believe so.

In any event, I believe that the transportation, because it's the -- because the fact that you happen to be running from police while you're transporting, you are still committing the crime.  And that was my thought process.  And I can definitely check those cites in the PSR for that.

THE COURT:  What do you say about that?  Putting aside the fact question of whether it crossed state lines.  We can look on the PSR and check that.  But that this crime is the transport, and so if the -- that is part of the crime,

was they were transporting it.

MS. ARNOLD:  Your Honor, so --

THE COURT:  That is, so it wasn't -- the crime wasn't really ripping the catalytic converter, sawing it off the car, but once it was stolen, putting it in the car, and driving a way with it.

MS. ARNOLD:  In that case, Your Honor, I return to the notion that the conduct at issue here is very different from what we were discussing in the other cases that the government has cited, where there are pedestrians, where we're in residential neighborhoods.  And so it's not clear that this conduct would rise to that level of reckless endangerment that is the enhancement.

MR. MALLARD:  It did go into -- so in paragraphs 101 to 103, it does cross over into Rhode Island, from -- Foxborough engages in the pursuit, and the crossing to Rhode Island, exiting onto Route 146, and then reentering Massachusetts.

THE COURT:  All right.  Let me talk to probation for a minute.

(The Court and probation confer.)

THE COURT:  Anything else either of you want to say?

MS. ARNOLD:  Your Honor, I did want to argue as to the enhancement --

THE COURT:  Anything else related to this, yeah.

MS. ARNOLD:  -- under C1.2.  And two points as to that, the first one we already touched on as to the first enhancement.  In all of these instances, as you mentioned, this is between 1:00 and 3:00 a.m.  It's largely on the highway.  There are no pedestrians.  So the conduct itself, we would argue, doesn't rise to the level of reckless endangerment contemplated by the enhancement.

But the other point is Mr. Mallard mentioned the reasonable foreseeability that there were three chases in this case.  But what pretty much every circuit to have considered this issue -- the First hasn't -- but they've all said that reasonable foreseeability is just not enough.  There has to be some kind of active participation by the defendant, if the defendant is not --

THE COURT:  Under 3C1.1 --

MS. ARNOLD:  Under 3C1. -- yes 1.2, yes.

THE COURT:  1.2, sorry.

MS. ARNOLD:  That's right.

And here, to the extent that there is evidence that Mr. Marshall was in the car, there is not evidence that he willfully aided or abetted or caused the car to be engaged in a high speed chase.  And so we would --

THE COURT:  All right.  So this is my ruling.  Insofar as the government seeks an enhancement under 3C1.2, I

overrule that objection for the reason that I read 3C1.2 that requiring that the defendant do it.  There is no evidence before me that he was driving the car, and there's no evidence before me that he was telling the driver of the car what to do or encouraging or enticing or any of those things.

There is evidence that he was in the car three times, but I don't think that's enough.

And I understand the point that you make, Mr. Mallard, that you could infer that one time is one thing, but by the third time -- but I think that's more of a foreseeability or acquiescence argument than it is active. So I overrule your objection as to that.

The 2B1.1 -- hold on -- I am persuaded of this under 2B1.1 -- let me find it again -- 2B1.1, subparagraph (b), subparagraph (16), subparagraph (A); that is offense involved, rather than defendant involved.  I think that's a correct and insightful distinction, and I think, at least for present purposes, it's limited to the crime, not to -- notwithstanding that the definition of offense in the guidelines includes relevant conduct, and relevant conduct probably includes flight.  I don't think that the offense here does.  I think it's just the conduct that equals the crime.  That's the way -- the only way to reconcile it.

That's what I understand *Hall* to be saying, and that's the only way to -- it seems to me that sensibly

resolves -- reconciles the 3C1.2 in this provision.  Because I can't imagine the guidelines would have written two provisions to enhance for the same thing.  That just seems like why would they do that?

But I do think here that since it's offense, it doesn't need to be Mr. Marshall, specifically, driving the car, enticing the car to reach the limits of the crime.  I hadn't thought about it until you argued, Mr. Mallard, but I think you make a good point that it's the transportation of stolen property is the crime, and this was the transportation of the stolen property.  It was in the back.  So I am persuaded to sustain your objection for that reason.

I think it's close, I will tell you both.  It's reckless.  My thinking is this, that you have high speed, 116, 15 miles an hour.  That's really fast.  The high speed at night, which is -- makes it, in some ways, less dangerous, because less people are around, but also more dangerous, because it's harder to see, and once, at least, with the lights out, that that's not negligent conduct.  That's, I think of, as reckless.

And conscious, I'm not sure it's conscious.  And I'm not finding conscious risk of death or serious bodily injury.  But I think that's reckless to -- there's a whole range of -- you know, it's reckless to somebody on the road.  It's reckless to the car spinning out of control and injuring

the people in the car and then injuring others on the road. The roads aren't completely empty at that hour.

And so I sustain the objection and apply that. So that's the second change to the guideline calculation. I impose the 2B1.1(b)(16)(A) enhancement of two points.

There were no other objections, right, Mr. Mallard?

MR. MALLARD: No. And I will just clarify the point on the dangerous weapon. I asked for that in Mr. Nicolas Davila's and Mr. Santos Feliberty's case. And I advance the argument in both of those cases that the tools used during the --

THE COURT: Yes, I remember that.

MR. MALLARD: -- apply.

When we negotiated this plea agreement, the case of *Walker* had not yet come down. That came down in December of '23. And this defendant had no firearm in his house during the search, so there was no firearm enhancement for the possession. And the government, when it negotiated this plea agreement, did not have any legal basis to seek the plus-two for use of the tool under the *Walker* -- the tools or weapons theory.

THE COURT: All right.

MR. MALLARD: So I'm not seeking it here. I am bound by the plea agreement. I stand by it. I'm not seeking the --

THE COURT:  And I don't believe I implied for the tools an enhancement --

MR. MALLARD:  You did not.

THE COURT:  -- in any event, in those other cases.

So all of that, when we're all said and done, means I reduce the guideline calculation by two points, and I enhanced it by two points, as distinct from the presentence report, which means that we end up, in the offense level calculation, in the same place, of a level 24.  And he receives a three-point -- Mr. Marshall receives a three-point reduction for timely acceptance of responsibility, is 21.

He has five criminal history points.  That puts him in the Criminal History Category III.  And that leads to a guideline sentencing range of 46 to 57 months; one to three years of supervised release; a $15,000 to $150,000 fine, if he can afford it; restitution --

Are we determining restitution -- are you seeking restitution, or --

MR. MALLARD:  Just for the Milwaukee tool owner, the individual who had the van stolen.  That's the only individual we seek.

THE COURT:  That's the --

MR. MALLARD:  It's about 12,000, I think, 695.

THE COURT:  Have you provided us the name of that person to include in the judgment to see who gets the money?

MR. MALLARD:  I have it here, and I can.

THE COURT:  Give to Ms. Dore after the hearing.

MR. MALLARD:  Absolutely.

THE COURT:  You're not objecting to that?

MR. CLOHERTY:  I'm not, only to the extent that probation will consider his ability to pay when we get there.

THE COURT:  Oh.  In terms of the schedule of payment.

MR. CLOHERTY:  Yeah.

THE COURT:  But not the fact of the obligation.

MR. CLOHERTY:  I think, given what has been presented to the Court, I don't think there's enough basis for an objection.

THE COURT:  Right.  I didn't think so, but I wanted to give you the chance to talk about it.

MR. CLOHERTY:  Okay.

THE COURT:  So restitution of $12,695 to the victim of the -- that one theft, that the government will identify the identity of the victim to be included in the judgment after the hearing.

And then the mandatory special assessment of $100 on each count, for a total of $200.

Without waiving any of your rights with respect to the various rulings I've made on the guidelines, do you agree that, given the rulings that I made, that's correct?

MR. MALLARD:  Yes, Your Honor.

MR. CLOHERTY:  Yes, I agree that -- yes.

THE COURT:  All right.  Fine.  Then I will hear the government, and then I will hear the defense, and then I'll hear Mr. Marshall, if he wishes.

MR. MALLARD:  Your Honor, without sounding like a broken record, I'll start again by saying I don't think the guidelines accurately reflect the nature of the conduct here. We are asking for 71 months, which is just about six years.

In this case, to put this defendant in perspective, the first defendant that we talked about was Nicolas Davila, and we asked for just about five years for him.  I believe we asked for 57 months or maybe even 60 months for him.

Santo Feliberty, we asked for --

THE COURT:  And I gave him 37.

MR. MALLARD:  37.

Santo Feliberty, we asked for 108 months, which ended up being an upward variance of -- I think the Court found 57 to 71.  It was an upward variance that I sought of about 20 some-odd months.  The Court imposed 57 months, slightly under five years.

Placing this defendant in context, Nicolas Davila did a little under 40 -- I'm sorry, a little over 40 cars.  I believe Santo Feliberty did a little over 50 cars.  I think it was 52 or 57.  This defendant is over 100 cars, on ten

nights of theft.  And then also the --

THE COURT:  Florida trip.

MR. MALLARD:  -- the Florida trip, and the, sort of, break in to the storage unit and the Milwaukee tools and wheels.

So he's got double the number of vehicles that Mr. Santo Feliberty had.  That being said, Mr. Santo Feliberty had two jewelry stores and three ATMs and some other stuff.  So it's almost a wash, in terms of the loss calculation in terms of the two of them.

I will say that they also shared similar criminal histories.  But I think Mr. Santo Feliberty's was worse.  I think he had two significant state prison terms.  He might not have served a lot of them, but they were, I believe, five-year terms, for serious jewelry store burglaries.

This defendant's criminal history, I don't think, is as significant.  There's sort of -- I don't want to say petty theft, because it certainly wasn't petty to the individual in Connecticut who had his garage broken into, but they are not of the same caliber.

THE COURT:  They are very different than what Mr. Feliberty committed, both before and during the federal offense.

MR. MALLARD:  Correct.  And without, again, beating a dead horse here, it's Rafael Davila that is the common

denominator of these guys operating at a very high level. This defendant -- I don't mean to be dismissive here -- Mr. Rafael Davila operates with discipline, with planning, and his system is so perfected that he can bring anyone along with him.  And for a number of nights, this defendant was that person because of his availability, his willingness to do it.  And you know, for whatever reason, he had the time and ability to just drop everything and drive down to Florida and drop off a whole load of catalytic converters or go out as many nights as he did.

It's not to diminish Mr. Marshall's culpability, but it certainly places him, I think, in context.  So when I ask for the six years, it's reflecting it's a serious criminal history of theft.  You know, there's an indicted case out of Connecticut.  There's a larceny out of Massachusetts that's probably an unarmed robbery on any other day, but for the fact that it wasn't indicted.  He pushes the man off and steals the ATV.

In the Connecticut case, there's a full-on burglary after a Craigslist, sort of, connection.  And there's a number of cases that don't score due to age, whether they be juvenile or what have you.  And a number of other arrests that don't even result in conviction.

So in terms of the criminal history, I don't want to say it's on par with Santo Feliberty, and I'm not asking

for a similar sentence.  But it's definitely the same ballpark as compared to Nick Davila, who had never served a day in jail before.  This defendant has a firearms offense where he served a significant period of time in the house of correction by comparison.

THE COURT:  How much time?

MR. MALLARD:  I think he served -- it was either 15 or 18 months.  So he gets out from that, commits the Connecticut burglary, gets a state prison term there in Connecticut, serves, I think, about a year of it, and then he's on probation.

Now, our thefts here start in, I believe, it's January of '24, if not December of '23, either way.  He's off that probation in July.  The Exhibit 1 in my memo is this defendant talking with Nicolas Davila, via text message, about selling catalytic converters to the other man in this case, Jose Torres, the fence, Goldy.  Those texts take place in May of 2022.

While I didn't charge him with any thefts in this case going that far back and I'm not saying that he violated his probation on this, it certainly gives you insight into what he was doing for a living.

He's got a pending case out of the Springfield area for the sale of some drugs to I believe it's a cooperating witness out there.  That case is charged and indicted in

state court.

So I just give that for context. I think the six years that I'm asking is proportional. It reflects his culpability.

But these crimes, these hundred some-odd vehicles, as I've said before, it's a very personal crime to a lot of these victims. I think the victim impact statements that I've put forth in the memo give the Court a flavor of how it affects the residence who wake up and have their vehicles torn apart; the businesses who lose the productivity of an entire fleet for weeks on end as they repair.

These aren't small costs that they bore. The $5,000, sort of, estimated loss, I think, is conservative in some respects, especially for the business trucks that have multiple converters that could cost upward of 15,000 to repair.

So that being said, this is not some simple property crime. There's a lot of impact here, both in terms of financial and emotional and psychological, even for the businesses who, you know, dreaded coming in to work on a Monday, fearing that their fleets would be ravaged again.

This defendant played a significant role in that. I think the number of thefts that he engaged in with Rafael Davila should really draw this Court's attention. I mention in my memo here, some of the largest nights of theft that

were proven involved this defendant being out with Rafael. And there were 13 vehicles in one night in Leominster, 16 vehicles in Shrewsbury, and 20 vehicles in Sterling.

And I mention the Shrewsbury one, because those guys got hit on January 31st. And then on paragraphs 207 to 210, those cops see that their town got hit with 16 vehicles, and they see the same car. And they're the ones that engaged in a high speed pursuit a few days later. And that's significant, I think, and should weigh in the Court's estimation of this.

So Shrewsbury gets hit January 31st, 16 cars. And then as it's stated on paragraphs 207 to 210, when they break into the Northborough storage unit, Shrewsbury happens to see the same maroon Acura riding around their town. They don't hit Shrewsbury that night, but they see it. And there's a high speed chase, because those cops know their town got ravaged. And that's one of the chases that we just mentioned here.

So these are a lot of thefts. These aren't small-time hits. Twenty vehicles in Sterling is no simple act. That's a well planned, well thought out, well executed scheme. Certainly, it's not a situation where you can just do it in five minutes. These are whole nights. These are entire days of work, taking place at night, hours on end, hundreds of miles.

I think, as this Court evaluates this case -- and obviously we're on our third sentencing here -- what brings this defendant to a greater sentence than Santo Feliberty? Well, it's the number of nights. I think the ten nights of theft are significant, the number of vehicles in each night. The loss amounts are equivalent. But, you know, this took place in the context of this defendant having more recent criminal history entries.

I think Mr. Kerner argued in Santos's case that his last actual charged incident took place in 2009, for a crime that was indicted in 2014. So I think he made a credible argument that, you know, we're here in 2021. We're talking about the last time that this guy had been convicted was for a 2009 offense.

That's not the same thing here with this defendant. Some of the crimes that he's been charged with are more recent. And the convictions date to, I think -- the drug offense -- I'm sorry, the firearm offense, that one took place in 2017. The burglary case out of Connecticut takes place in 2018. He pled guilty to that in November of '18, got five years, with one to serve, with three years probation, got terminated in 2022. There's much more recency in terms of his criminal history, and there's much less of a mitigation argument there, as compared to Mr. Feliberty.

So that's part of the reason why I'm asking this

Court to go above the number that Mr. Feliberty got -- not substantially more, not nine years that I asked for Santo, but one that, I think, reflects the defendant's criminal history, one that is going to specifically deter him going forward.  I think 71 months, six years, is a palpable number, one that is going to be meaningful to the defendant.  I think that sends a strong message both to him and to others.

He's certainly not the mastermind, and I credit the arguments of all the defense counsel so far.  These guys are not the mastermind.  Rafael is.  But when these guys saw a good plan, one that was very lucrative, one that would make them thousands of dollars per night, they jumped on board what he was doing.  And time and time again, they found themselves in the car with him, doing the work that he put them up to.

And for this defendant, there was an additional level of traveling down to Florida with him to help monetize it, to help seek out higher prices for themselves, for what they wanted to get.

So I think just punishment also calls for a sentence that exceeds the 57 months, around the six years that I'm asking for.  I think deterrence, public protection is also well served.  I think the Court needs to consider protecting the public from the thefts.

As the Court knows, we've had a substantial and

significant decline in catalytic converters theft in the past year.  It's almost eradicated.  There's a number of factors in this, but I will certainly credit the fact that we charged, I would say, the lion's share of reported thefts in this case, that were attributable to this crew.  We took them off the street that led to that decline in a meaningful way.

So for all of those reasons, Your Honor, I'm going to ask the Court to impose a 71-month sentence, roughly six years.  It's consonant with justice, all the sentencing factors.  It's no more than -- it's no greater than necessary to achieve those purposes.

THE COURT:  Thank you.

Mr. Cloherty?

MR. CLOHERTY:  Sure.

I think, actually, I was close to agreeing to the first, sort of, five or six minutes of what Mr. Mallard said.  And I'm not trying to make light of this, but I think, at the beginning of his presentation, he did, I think, fairly characterize at least the three defendants who have been before Your Honor.  And we'll acknowledge that Mr. Nick Davila had fewer thefts and maybe lesser activity.  I think there was maybe a related drug charge.

But I don't think it's right to suggest that -- just jumping right into the disparity argument, I don't think it's right to treat Mr. Marshall on the same level as

Mr. Feliberty.  And I think there really are qualitative differences.  I think they -- everybody's different, and they all make their way to Category III with different paths.  So they are the same criminal history, I believe.  But I think there you had much more planning involved, as I understand it, where there was some ATM or jewelry store thefts.

THE COURT:  Both.

MR. CLOHERTY:  So again, not my client.  And I think that was -- that really does distinguish.  We do end up -- maybe the loss amount ends up the same, but I do think there's a qualitative difference in the conduct.

And so our memo, I think you saw our memo, when we were advocating for 37 months, I guess I'll throw that out there.  But I kind of recognize, given what the Court's rulings on the guidelines that that's a less compelling argument, so I'm going to adjust it a little bit, which is to really argue for something on the range of 41 to 42 months, which is below the guideline range that the Court has concluded, but does match up with the JSIN data that you've seen that's attached to the report.

And I know that data is what it is, and we've been talking about it for the last couple of years.  But it is somewhat instructive that there's -- that that's -- that suggests that that's about the right spot for Mr. Marshall here.  And I think it is about the right spot, given where

Mr. Davila is and where Mr. Feliberty is.

And there's a couple other factors.  Obviously, I don't have to talk to the Court about what the 3553 factors are, but let me just start, which is, notwithstanding the government's argument about the need for close to a six-year sentence, we're not proposing a nonserious sentence.  A sentence of approximately 40 months is a serious sentence for Mr. Marshall.  It's longer -- significantly longer than anything that he's previously served and we do think would serve the statutory purposes of deterrence, sending a strong message to the community.

It's also long enough to allow him to avail himself of many of the services that I think you can see in the PSR that he needs.  And that I think the last year has been tough.  I mean, that's not going to get a lot of sympathy from the Court.  I understand.  It's a tough situation.  But he has started to open himself up to a process where I believe -- and you'll hear from him a little bit.  He's going to try to talk to the Court -- recognizes the need to change his path.  Because if that path continues after this is over and he's in front of you again, it is not -- it wouldn't be a good situation.  I know you know that.

But he -- he has struggled with gambling.  That's obvious.  He has struggled with substance abuse, particularly in the wake of a pretty serious injury that he suffered and

struggling with Percocet.  It doesn't excuse his offense here, but he's grappling with that.  He's grappling with, sort of, understanding where this path of petty theft -- and I think it is fair to, sort of, call it petty theft -- but escalating theft, to some degree, that let led him to this.

And I think a 40-month sentence would allow him, during that term, to avail himself.  He wants to get his GED. I think he's not that far away from getting it.  There's an RDAP recommendation that we think is appropriate for him, that he needs to work on that.

I have to be honest, we've scoured the BOP about gambling addiction issues.  I don't know how many programs they have, but that's certainly something that he's going to have to be dealing with during his period of supervised release.  I have to believe that probation would be recommending it.

But all of that is -- the sentence would allow him to receive the type of training and care that he needs in a correctional setting, would also avoid what I think could be a sentencing disparity with respect to the other defendants.

And then I guess I'll just note, and I think the Court is aware of it, you've read the letters from his family, he has had a challenging life.  But there are -- there are signs there that he is young enough that he can turn this around; that he's young enough that, if he can

grapple with some of the demons that he's certainly dealing with, both physical and certainly on the gambling --

He's got a supportive family. They're here today. He's got three kids who adore him and that he, you know -- that he's going to be away from them. And that is going to be a difficult situation. But to not keep him away from them for so long that those relationships can't be rebuilt in a productive way.

And so the fact that he has that -- sometimes I represent the clients who don't have that and that is a challenge. He has that, so there's an opportunity here.

I know Mr. Mallard referenced the prior probationary period. And actually, I view that as a positive. He actually, during that probationary period, he was doing pretty well for the most part. It's actually -- coincides when probation ends that pretty soon he's wrapped up in Mr. Davila's -- the conduct that's the subject of the case, I guess I'll say.

I know Mr. Mallard emphasized, sort of, the number of thefts. I'm not sure the characterization is exactly right. There's a good number of thefts in the teens, and I think one that crosses to the 20s that Mr. Marshall isn't involved in. I'm not so sure that there's a huge difference between stealing 14 and stealing ten on a particular night. You go where you go. So they're serious, and the people who

were impacted by those thefts, it's a serious theft.  And I don't want to minimize it.  But I also don't think it's fair to sort of suggest that he was involved in the big thefts and other defendants weren't.

I think this is a crime, as I see it, certainly of planning, but also opportunity once you get there, you know, what you can take.  And maybe you're able to take, you know, more than one.  There's plenty that are in the very low single digits.  So he's responsible for what he did, and he's trying to take responsibility.

So I don't want to recite the statute to you, but the goal here is to provide a sentence that's sufficient, but not greater than necessary, to satisfy the purposes of the statute.  And I think a sentence of -- and I'll say 41.  That matches up the JSIN, puts him in a slightly different posture than Mr. Nick Davila, but not at the higher level, would be enough to allow Mr. Marshall to take the steps that he's got to take -- after this, it's on him to do that, but I think he's young enough, and there's signs here that he can do it.

And so combination -- and I tell my clients this.  I know you'll say it.  When we're talking about a sentence like this, it's not just the 40 months.  There's a long period afterwards that's a significant part of his reintegration.  And he has issues that I think he's going to -- he's started to work on through the work that he's been

trying to do at Wyatt, but I think it will get better or have more opportunity at another facility to do that.  But he'll have to keep working at that during that period of supervised release, or else, you know, we'll be back here and it could be -- that's not the path that he wants to be on.

But I think he has the tools.  He has the support network to do it.

And so that's what this is about.  It's about what's forward for him and to try to create something.  It's also about the victims; it's also about the crime.  I don't want to minimize the punishment part of it.  But for him, I think a sentence of 41 months is more than sufficient to achieve all of those goals, send a message of deterrence that the Court wants to send, give him an opportunity to reintegrate into society, and to try to move forward, get back with his family.  So that's really the guts of the argument that I want to make about sentencing.

I have some specific things that I'd like to raise, I don't know if you want me to do it now or --

THE COURT:  What are they?

MR. CLOHERTY:  He would like -- I recognize that the Bureau of Prisons doesn't have -- that you don't control where they send him.  He would love a recommendation, if the Court is willing, to Danbury, which I think has an RDAP program and is not so far from his family that he would be

able to visit and stay with them.

I guess I'll formally ask that the Court waive any fine, based on an ability to pay.  And to the extent there's any ability to pay, he's going to have to start working off the restitution order that's going to be a part of this.

THE COURT:  I don't think the government is asking for a fine.

MR. MALLARD:  No fine.

MR. CLOHERTY:  Okay.  Okay.

THE COURT:  And I think for the reasons that you articulated, it's not appropriate to impose it.

MR. CLOHERTY:  And I think that's it.  I'm happy to answer any questions.  But that's where we are in this, Your Honor.

THE COURT:  Okay.  Thank you.

Mr. Marshall, you have the right, if you wish, to speak on your own behalf, to say whatever you want to say, before I impose sentence and determine what sentence to impose.  It's what's called your allocution.  You don't have to say anything.  If you want to remain silent, as is your right, you can do that, and I won't hold it against you.

But if you want to speak, now is the time to do so.

MR. CLOHERTY:  He wrote something down, so he's going to try to read.

THE COURT:  Go right ahead.  That's fine.

MR. MARSHALL:  Thank you, Your Honor, for this opportunity to address the Court.

I would like to start by taking responsibility for my actions and expressing remorse for the effects it had on my victims.  I had a year to think about what I have done and consider the consequences of my actions and how my actions affected other people, to look at the things I never considered before my arrest.  It opened my eyes while reading the victim impact statement and seeing how their lives were affected, the disruptions to their lives, the inconveniences it caused, the time they missed from work, the cost of the repairs, and the cost of their lives and livelihood.

The profit was as far as I had originally looked. It didn't seem so bad when I looked at it in that perspective.  However, I can see now how much damage that I've done and the true cost of my crime.

I'd like to offer my sincereist apology to the people, the businesses -- the businesses victimized as a result of my actions.

In taking responsibility, I think it's important to offer some insight into what motivated me to do what I did. In the months prior, I developed a serious gambling problem and Percocet addiction.  I don't say this makes an excuse.  I say this to offer an explanation.  I was involved in casino gambling, and as the stakes got higher and higher, the losses

became insurmountable.  The more I lost, the more I chased.  It was a cycle that I couldn't break.

I've had a lot of time to think.  I believe it's given me a chance to grow up.  When I was younger, I wouldn't have taken responsibility for my actions, but now I'm learning to do that now.

I am truly sorry for what I've done.  I'd like to apologize to the government, the Court, for the time, the effort, and the money they spent.

I'd like to apologize to my family for the financial strain and the impact my absence will have on my three children.

But most I would like to apologize to the victims and inconveniences to the businesses and the people that I've victimized.  And I'd like to offer the Court my assurance to not to repeat these crimes in the future.

THE COURT:  Thank you, Mr. Marshall.

MR. MARSHALL:  Thank you.

THE COURT:  Give me one moment.

(Counsel and the probation officer confer.)

THE COURT:  So a couple of quick things.

Mr. Marshall, first of all, that was a very nice allocution.  You seem to genuinely recognize what -- what you did and how it has affected a variety of different people.  And there are many people who can't think beyond themselves

as to how their conduct affected themselves or maybe their family, but you appreciate how to affected you and your family and the victims and a lot of people.  And so that suggests to the me you've done a lot of hard work at the program at Wyatt to think about why you are where you are and where you want to be.  So I -- I just tell you that's a good thing, and I urge you to continue that while you're in prison.

And I was also struck by one thing, that you have video calls with your children, it seems often, if not every night.  And I give you credit for that.  I mean, your family didn't commit these crimes, but they will suffer from your absence, particularly your children.  And so your effort each day -- it's much more about what you actually do, so, for example, having a video call with your children or visits with them or writing them letters.  Then it is about your -- about expressions of desire to be a different kind of parent when you get out.

If you want to be a different kind of parent, you start now.  You obviously can't be there every night because you're in prison, but you can do something.  If you want to be different and you want the future to be different than your past, the time to start is now.  You clearly made some efforts to do that.  So that's what I'm telling you that.  And the time to do that is to continue each day.  It's not to

do it later, it's to do it now.  So I give you credit for that.

I will tell you both that just the way I think about -- not the only factor in Mr. Marshal's sentencing, by any means, but a very important factor in my mind is where Mr. Marshall sits vis-a-vis the other people that I've sentenced in this case.  And while this is not an enumeration of every factor that is relevant, I see him as meaningful more culpable than Mr. Nicolas Davila, primarily because their loss amount is greater as reflected in the guidelines.  It's just more.

There are some other factors about Nicolas Davila that may be aggravating that aren't present here, but nonetheless, on balance, he's more.  And I think to me, thinking about that, in terms of 3553 factors, it has to be meaningfully more than him.

On the other hand, I view Mr. Feliberty just in a different category.  Not -- he had less catalytic converter thefts, but catalytic converter thefts are not nearly, in my view -- they're bad, but they're not as serious as the robberies of the jewelry stores.

The robberies of the jewelry stores are more violent, even though there were no people there.  They are more brazen.  They are a different kind of crimes.

And the -- the successful and unsuccessful attempts

to literally steal ATM machines from banks is a different level of crime.

And he had -- if I remember right, there was a gun at his house.

That all makes him worse.

So I understand why -- and fair for you to be putting, Mr. Mallard, everyone in proportion to the recommendations that you are making.  No problem.  But from my perspective, even though he had -- Mr. Marshall has more catalytic converters, not appropriate to give him a number equal to or above Mr. Feliberty.  He should be below that.

There are other factors, under 3553, his personal circumstances and history.  But in Mr. Feliberty's case, I think he falls pretty much between -- I'm sorry, Mr. Marshall falls pretty much between Mr. Feliberty and Mr. Davila.

Balancing out there are other considerations, but I don't think, in his case, the guidelines are really unrepresentative of what should be in a -- so I think that, on balance, the 47 months is the sentence that I would impose.

It's not as low as you recommend, Mr. Cloherty.  I see why you do.

I understand the JSIN data.  I -- I just never, to be frank with both of you, know what to do with the JSIN data, because it's just an aggregate number, and I think it's

an individualized determination of the person in the case.

So that seems to me, I place him at 47, because it's between the two, and that seems about right.  And it's not quite the low end of the guideline range.  He has some extenuating circumstances.  There could be things to warrant a variance, but here the conduct is pretty sustained and significant, and so I'm not sure that it's quite -- that tilts me in the other way.

So on balance, and considering the factors under 3553, that's where I've landed for the sentence, and that's the explanation for the sentence.

There is one or two other things to tell you, Mr. Marshall.  Besides the fact that you -- if you want the future to be different than the past, you need to -- you do what you did, which is, you started before today in what you're doing, and you keep doing that every day in prison.  You change the way -- you stay connected to your children.  You stay connect to your family.  That's something that you do every day.

And every day in prison, you decide that you want to spend your time with people who are abiding by the rules, trying to take advantage of programming, trying to take advantage of the opportunities such as they are for you.  Or do you -- do you spend your time with people doing something different?  That's a choice.  And you make -- and if you make

the choice to do the right thing and spend time with people doing the right thing, that will help you.

I'm not saying that it's going to be easy, but it is something that you have some control over.

If you don't do that, looking at your presentence report and the problems that you've struggled with and your history, what you're really doing --

Have you ever heard of life on the installment plan?

MR. MARSHALL:  No.

THE COURT:  Life sentence is a sentence for the rest of your life.  Right?  Not -- that's not, obviously, what's happening here.  But the installment plan is, instead of just getting it once, you do 15 months in county time, and you get out.  And then you get, from me, 47 months.  And then you get out, and then you commit a new crime.  And you go back in for probably more, because generally that's the way it works.  You generally get more each time.  And so you end up spending most or all of your life in prison, you just do it on an installment, in a series of convictions.

That's sort of where you could be going, but you have control over that.  You also seem like someone who doesn't want to do that.  And you have a lot of people here who clearly care about you and would like to see you go in a different path.  So you need to work hard at going in the

different path in order to go on that different path.  You have to do it.  It's not always easy.

And part of this is you're going to be on supervised release.  So the sentence that I'm imposing is --

You should stand for this part.

MR. CLOHERTY:  Yes.

THE COURT:  Pursuant to the Sentencing Reform Act of 1984, and considering the factors at 3553, I'm imposing a sentence.  You're committed to the custody of the Bureau of Prisons, to be imprisoned for a term of 47 months, which is 47 months on Count 1, 47 months on Count 5, to be served concurrently.

I make the judicial recommendation -- I make --

Let me just look at all of these.

So Sam, I first make the recommendation that he serve his sentence at FCI Danbury to facilitate contact with his family.

And second, I'll make the recommendation for the RDAP program that's included in the presentence report, because he seems to qualify.

And do you want the recommendation also with respect to medical care for medical needs?

MR. CLOHERTY:  Sure.  Well, it needs to be mindful, I don't want that to bump him out of Danbury, I guess is my question.  I don't know enough about what they have.  He does

have medical needs.  They will need to be dealt with, although he's been managing it at Wyatt.

THE COURT:  Sam, you should -- the recommendation -- let's, first, the Danbury; second, the RDAP program; and then, say, third, institution commensurate with security for the medical needs.

MR. CLOHERTY:  Fine.  That's fine.

THE COURT:  Then the second part, and the reason that I was saying life on the installment plan, when you get out of prison, you're not all done.  You'll be on supervised release for three years.  There are various conditions, which I'll tell you about in a minute.

Supervised release is a form of probation.  And there are -- if you take advantage of it, there's a lot of resources, and probation will try to help you and they'll help you succeed in being employed, and so forth, in going forward.  But if you don't, as you'll remember from your plea hearing, you'll be back before me.  And you don't get a jury trial about whether you violated the conditions of your release, and then I can send you back to prison for more time than you've already served, for a violation.

And then when you get out of prison from that, guess what you get?  More supervised release.

So that's why I urge you, particularly, to take the path of -- that you seem to have chartered for yourself of

trying to make a different life.  So you're going to have to work on the drug problem and the gambling problem, and you're going to have to work on it when you get out, too.

So within 72 hours of your release from the custody of the Bureau of Prisons, you'll have to report in person to the district to which you're released.

I'm imposing that you owe restitution to the victim that Mr. Mallard will give us the name of, in the amount of $12,695; that the terms are while you're in prison, pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program, and then later pursuant to probation's schedule that they establish.

You make all the payments to the clerk, US District Court, and then you'll have to notify the US Attorney for this district within 30 days of any change of mailing or residence address that occurs while you owe the restitution amount.

I impose no fine, as I find you do not have the financial ability to pay a fine in addition to restitution. And, in any event, restitution should come first.

Is there forfeiture here, Mr. Mallard?

MR. MALLARD:  Not for this defendant, no.

THE COURT:  All right.  And then I'm -- have you reviewed the conditions of supervision, Mr. Cloherty, with your client, on pages 87 and 88, such that you waive reading

of them in their entirety?

MR. CLOHERTY:  Yes.

THE COURT:  So I impose the mandatory conditions that appear on page 87, 1, 2, 3, and, 4.  I highlight one of them for you, Mr. Marshall:  You shall not commit another federal, state, or local crime.  So if you commit a crime, you violate your conditions of supervised release, and probation will bring it to my attention.  We'll have a hearing, and I can send you back to prison.  So don't do that.  That's why you need to stay on the path you're on.

Second, I impose the standard conditions that the Court has adopted from Section 5D1.3(c) of the guidelines.

Third, I impose the special conditions that appear on page 88, conditions 1, 2, 3, 4, 5, 6, 7, 8, 9, which -- all of which will be in the judgment that you receive and will also, when you begin supervision, they'll go over them with you.  But they're in the PSR and Mr. Cloherty went over them, so I'm not going to read them now.

And I add 10, that you make -- I make a judicial recommendation that you consider participation in the Court's CARE program, if you're then deemed an appropriate candidate.  That's a program for people who have come out of prison who have a serious substance abuse problem.  And it's more work and more benefit so -- like most things.  And so -- and if you graduate the program, then you can earn one year off.

Your three years can become two if you graduate.

And there's a mandatory special assessment of $200 in total, and then you have the right to --

Is there anything else, Mr. Mallard?

MR. MALLARD:  I misspoke about the forfeiture. It's $1,467 that was seized from the defendant.

THE COURT:  Okay.  Then I award forfeiture.  I allow the forfeiture in the amount that Mr. Mallard just said.  And we will include that in the judgment.

Anything else?

MR. MALLARD:  No.

THE COURT:  Then you have the right to appeal from this.  Any notice of appeal is due within 14 days of today. If you can't afford to have the notice of appeal done, you can ask the clerk to prepare it on your behalf.  You can speak about it with Mr. Cloherty.

There was a plea agreement in this case, so the plea agreement provides you waived various rights to appeal. You can talk about that with Mr. Cloherty, as well.

Anything else from probation?

THE PROBATION OFFICER:  No, Your Honor.

THE COURT:  Anything else from the government?

MR. MALLARD:  No, Your Honor.

THE COURT:  Anything else for you, Mr. Cloherty?

MR. CLOHERTY:  I have one thing.  It actually

doesn't relate to the judgment, though, just a question for you.

Mr. Marshall has a pending -- it was alluded to before, it is a pending case in Hampden County Superior Court.  His next hearing in that case is on April 23rd.  And Wyatt has been, to date, reluctant to allow him to video appear.  Although Hampden would allow him to appear by video, Wyatt has not allowed it.  I don't know if the Court would be open to --

THE COURT:  Why hasn't Wyatt allowed it?

MR. CLOHERTY:  I don't know the answer to that question.

But the only reason that I raise it is because you may know that --

THE COURT:  I don't have -- I think he should appear on that because it's a state case.  I often allow people -- sometimes what comes up, pre Zoom, was we allowed people to appear in person on a habeas, if the government signed off and everybody signed off.

You don't have any objection, do you?

MR. MALLARD:  No.  And there has been no habe. request, which I think is why Wyatt, vis-a-vis the marshal, hasn't allowed it.

THE COURT:  I see.

MR. MALLARD:  But I can talk to Hampden, and they

just have to issue habes to the marshal to facilitate the video.

MR. CLOHERTY: Okay. Why don't we do that. Here's why. If, somehow, unfortunately, that becomes a default, that can, unfortunately, have administrative -- create administrative interference on his participation.

THE COURT: I would prefer him to face the cases that he has and resolve them by whatever form they get, whether trial or plea or dismissal, whatever happens. So unless there's a -- if Wyatt had a specific reason, or the marshals, why they didn't want him to appear in that case for some security reason, that would be different. But it's hard to imagine why they would think that.

So I suggest the two of you talk. And if it needs a habeas writ to appear by Zoom, then submit it. And if everyone appropriate signs off, I'll sign off on it. And if it's just you want -- you can tell -- you can talk to the marshals or Wyatt about it and say I -- absent a specific reason, I recommend that he be allowed to appear by Zoom from Wyatt custody, at a proceeding in state court, and so that he can do whatever they want to do in state court.

MR. CLOHERTY: That will be great. I'll speak with Mr. Mallard, and if I have to file something with you, I'll file something with you.

THE COURT: Yeah. That's fine. Okay. Thank you.

We stand in recess.

(Court in recess at 4:38 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 13th day of August, 2024.

/s/ RACHEL M. LOPEZ

_____
Rachel M. Lopez, CRR
Official Court Reporter